## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

UNITED STATES,

       **Plaintiff,**

v.                                                          **2:17-cr-20147-TLP-1**

De'LEWIS HOLLINS,

       **Defendant.**

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant De'Lewis Hollins' Motion to Suppress. (Docket Entry "D.E." #33). The instant motion was referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #47). An evidentiary hearing was held on January 18, 2018. For the reasons set forth herein, Defendant's Motion is hereby DENIED.

### I.    Introduction

On May 25, 2017, Defendant was indicted by a grand jury of this Court with one count of assaulting a person having lawful charge, custody and control of United States Mail (Count One), one count of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer or employee of the United States (Count Two), and one count of knowingly possessing the electronic benefits transfer card of another with the intent to commit food stamp fraud (Count Three). (D.E. #2).

1

On November 27, 2017, Defendant filed the instant Motion to Suppress pursuant to Rules 12(b)(3)(c) and Rule 41(h) of the Federal Rules of Criminal Procedure alleging that Defendant's rights under the Fifth Amendment, Sixth Amendment, and Fourteenth Amendment were violated.  Accordingly, Defendant sought the suppression of all statements attributed to Defendant and all evidence subsequently obtained by those statements.  On December 11, 2017, the Government responded that no constitutional violations occurred and, therefore, that suppression of evidence was not appropriate.

**II.    Proposed Findings of Fact**

### a. *Events Transpiring at the Scene of Arrest*

At the evidentiary hearing, ten witnesses testified as to the events surrounding Defendant's arrest and subsequent questioning at the Mount Moriah precinct.  United States Postal Inspector Robert Weeks ("Inspector Weeks") testified that he was a part of a team investigating the robbery of a postal carrier at the Dogwood Trace Apartments at the intersection of Winchester and Knight Road in January 2007.  (Tr. at 10:8-11:6, 11:24-12:3, 14:1-5).  A suspect was developed through an investigation in which they learned that EBT cards were stolen from a victim and used for purchases at a gas station.  (Tr. at 11:9-15).  Surveillance video was obtained from the gas station, and the description of the suspect was concluded to be "a black male approximately six foot one [sic], six foot two [sic], wearing a dark beanie that had a Bulls emblem on top of it or the front of the beanie itself, dark clothing."  (Tr. at 11:16-23, 12:15-20, 16:15-17).

On February 2, 2017, Inspector Weeks was part of the team who was surveilling the area for the suspect and observed a person matching that description.  (Tr. at 13:18-25).  Inspector

Weeks was positioned at the intersection of Winchester and Knight Road adjacent to the apartment complex at a convenience store beginning at approximately 4:45 a.m. that morning. (Tr. at 14:6-10, 19:2-5). The team inside the apartment complex "positively ID'd the suspect wearing the Chicago Bulls beanie" and radioed to Inspector Weeks that he was heading in his direction and to stand by for further information. (Tr. at 14:20-25). Inspector Weeks "got the direction that he was going" outside of the apartment complex facing northbound on Knight Road, saw the suspect cross the street, turned on the blue lights on his vehicle, and approached the suspect in his vehicle before he got to the intersection where he could flee on foot. (Tr. at 15:1-7). Inspector Weeks "cut him off," and as he was getting out of his vehicle, announced himself, drew his weapon, pointed it at the suspect, and told him to place his hands into the air. (Tr. at 15:9-13). The suspect complied, and Inspector Weeks directed him to the front of his vehicle, made him place his hands on the front of the vehicle, holstered his weapon, and detained him with handcuffs. (Tr. at 15:12-17). Inspector Weeks' contact with and detention of the suspect occurred between 9:00 a.m. and 9:30 a.m. (19:6-13). Inspector Weeks testified that there was no physical struggle with Defendant at any time. (Tr. at 15:18-20).

Inspector Weeks testified that, after he detained Defendant, the rest of the team "came upon him," that United States Postal Inspector Darren Riggs ("Inspector Riggs") took over and did a "thorough search," and that Inspector Weeks was "hands-off" after that. (Tr. at 16:3-9). Inspector Weeks did photograph the suspect "as it was happening." (Tr. at 16:7-17:2 & Collective Exh. 1). Inspector Weeks testified that Defendant was "argumentative" and "kind of upset" after being detained, and Inspector Weeks told him to "be quiet" and "keep his mouth shut." (Tr. at 17:15-20). Inspector Weeks reiterated that he did not have to use any physical

violence against Defendant, that he did not see anyone else use any physical violence against Defendant, that he did not observe Defendant complain to him or anyone else about pain or discomfort, and that Defendant had "no injuries to his face." (Tr. at 17:15-18:18, 21:10-12). Inspector Weeks testified that neither he nor anyone he observed began asking investigatory questions of Defendant and that he did not advise Defendant of his *Miranda* rights. (Tr. at 17:15-18:18, 19:20-20:4). Inspector Weeks testified that a Memphis Police Department ("MPD") transport officer arrived at approximately 10:00 a.m. and that Defendant was ultimately taken from the scene by the MPD officer for questioning. (Tr. at 17:15-18:18, 20:16-21:3). Inspector Weeks testified that he did not go to the MPD precinct to assist in any questioning. (Tr. at 21:13-14).

Inspector Riggs testified that he was also part of the team investigating the robberies at the Dogwood Trace Apartments in January 2017. (Tr. at 24:1-8). He testified that the physical description of the suspect was developed because the victim's EBT card was used at Knight Arnold grocery on January 31, 2017 where video surveillance recorded his image. (Tr. at 25:12-17). Inspector Riggs was aware of the suspect's description when he went to conduct surveillance at the apartment complex on February 2, 2017 and observed a man matching the description on that date. (Tr. at 27:25-28:6). Inspector Riggs was parked in the Dogwood Trace Apartments and saw Defendant walking through a breezeway, crossing over the road, and walking towards the gated exit of the complex. (Tr. at 28:8-16). He got into his vehicle, and radio communications were made advising of the suspect's movements. (Tr. at 8-18). Defendant exited the pedestrian gate, crossed Knight Road, and was then stopped by Inspector Weeks when he "pull[ed] up and block[ed] that sidewalk and that southbound exit off of

4

Knight." (Tr. at 28:17-21, 31:25-32:21). Inspector Riggs then went to the location where Inspector Weeks had detained Defendant, parked several yards from him, and observed as Inspector Weeks was handcuffing him. (Tr. at 29:3-8, 31:20-24, 32:22-33:14).

Inspector Riggs testified that the photographs taken by Inspector Weeks truly and accurately represented Defendant's appearance on February 2, 2017. (Tr. at 29:12-20 & Exh. 29). Inspector Riggs testified that he did not observe any injuries to Defendant on the photographs. (Tr. at 29:21-23). Inspector Riggs testified that he did not conduct any physical violence against Defendant nor did he witness anyone do so. (Tr. at 29:24-30:4). Inspector Riggs testified that he did not observe Defendant complain to anyone about physical pain or discomfort as a result of his detention and arrest. (Tr. at 30:5-9). Inspector Riggs testified that he did not perform any investigative questioning of Defendant, that he did not see anyone else perform investigative questioning of Defendant, and that he did not hear Defendant ask for an attorney, ask for any type of investigation to cease before he obtained an attorney, or receive his *Miranda* rights. (Tr. at 30:10-19, 33:15-17, 34:20-24). Inspector Riggs testified that MPD arrived within approximately ten to fifteen minutes of Defendant's arrest to transport him from the scene. (Tr. at 31:2-9, 35:8-22). Inspector Riggs was not involved in any questioning of Defendant at the MPD precinct. (Tr. at 31:10-13, 36:12-13).

MPD Officer Justin Crutcher testified that he was on duty on February 2, 2017 and was called to the Dogwood Trace Apartments to assist in transporting a suspect back to the MPD precinct. (Tr. at 39:8-40:7, 41:1-10). When Officer Crutcher arrived, Defendant was already in custody and handcuffed. (Tr. at 41:11-13, 44:20-25). Thus, Officer Crutcher and his partner, Officer Jacoba Boyd, transported the individual to the precinct. (Tr. at 41:16-25, 50:8-9).

5

Officer Boyd took the suspect in his vehicle, and Officer Crutcher travelled separately in his own.  (Tr. at 42:1-11, 42:19-21, 47:5-).  Officer Crutcher testified that he did not conduct any physical violence against Defendant, did not observe any physical injuries on Defendant, did not hear Defendant complaint of physical pain or discomfort, and did not witness anyone else conduct any physical violence against Defendant. (Tr. at 42:22-43:15).  Officer Crutcher testified that there was no physical violence or struggle to get Defendant into the MPD vehicle for transport and that he did so "willingly."  (Tr. at 43:16-22).  Officer Crutcher testified that he did not begin an investigative interview with Defendant and that he did not witness anyone inform Defendant of his *Miranda* rights.  (Tr. at 43:23-44:4, 46:11-13).  Officer Crutcher testified that he was "pretty sure" he had a body camera on that date, that it should be on when he is interacting with citizens, that body camera footage is later retrievable, but that he did not have a dash camera in his car.  (Tr. at 47:19-49:7).  Officer Crutcher testified that he thought Officer Boyd also had a body camera but not a dash camera.  (Tr. at 48:9-21).  Officer Crutcher was aware that Defendant was questioned later on that day at the MPD precinct but was not himself involved in the interview.  (Tr. at 44:5-9).

Officer Boyd testified that he was also involved in the transport of Defendant from the area near the Dogwood Trace Apartments to the Mount Moriah precinct.  (Tr. at 50:21-51:8, 51:23-52:1).  When he arrived on the scene, Defendant was already arrested and in handcuffs. (Tr. at 53:24-54:5).  Officer Boyd neither observed Defendant complaining of any sort of physical violence or pain nor did he observe Defendant being assaulted, injured, or involved in a physical struggle.  (Tr. at 52:2-13).  Officer Boyd testified that he believes that he was the person who placed Defendant into his vehicle and transported him to the precinct for questioning.  (Tr.

at 52:14-23, 55:23-56:3).   Officer Boyd did not perform any investigatory questioning of Defendant or observe anyone else doing so.  (Tr. at 52:24-53:6).  Officer Boyd does not recall Defendant asking for an attorney or asking for any investigation to stop or cease.  (Tr. at 53:7-10, 57:24-59:7).  Officer Boyd did not advise Defendant of his *Miranda* rights.  (Tr. at 56:4-8). Officer Boyd testified that he had a body camera but did not recall if it was on although it is supposed to be under MPD policy.  (Tr. at 56:9-19, 64:21-66:12).  Officer Boyd testified that he did not recall if he had a dash camera but that, if he did, it also should have been on.  (Tr. at 57:2-9).  When Officer Boyd arrived at the precinct with Defendant, Officer Boyd performed a pat-down of Defendant and believes that he asked Defendant if he wished to use the restroom and placed him in a holding room.  (Tr. at 53:11-18, 58:9-16, 59:8-22, 66:13-20).  Officer Boyd does not remember if Defendant had a wallet or any money in his possession.  (Tr. at 66:21-24, 67:16-17, 68:13-15).

### B.  Events Transpiring at the Mount Moriah Precinct

United States Postal Inspector Branden Guffey ("Inspector Guffey") testified that he first came into contact with Defendant upon his arrival at the Mount Moriah precinct.  (Tr. at 70:24-71:6).  Inspector Guffey testified that he and United States Postal Inspector Gregory Newberry ("Inspector Newberry") were waiting for Defendant's arrival at the precinct, and he was sitting in the interview room when they walked in.  (Tr. at 71:7-13, 82:8-16).  The interview room was approximately "ten by ten" with his foot chained to the floor.  (Tr. at 86:18-87:2).  Inspector Guffey did not speak with any of the "street patrol officers" before interviewing Defendant, and he was not informed before the interview that Defendant had requested an attorney.  (Tr. at 9-20).  Inspector Guffey did not pat down Defendant or have any physical contact with him.  (Tr.

at 82:21-24).  They began by informing Defendant of his *Miranda* rights at approximately 11:00 a.m., which he waived.  (Tr. at 71:14-22, 73:11-75:1, 75:11-20, 82:17-20, 83:24-84:2 & Exhs. 2 & 3).  Inspector Guffey did not inquire about Defendant's mental health, his education, his ability to read and write, whether he took medication or had missed any dosages of it, or whether he was intoxicated because he had no reason to suspect any concerns in these areas.  (Tr. at 88:10-89:7, 93:15-94:2).  Inspector Guffey testified that Defendant "seemed coherent, able to answer questions, [and] was able to communicate" and "seemed to understand what was going on."  (Tr. at 93:25-94:1, 94:7-9).

Defendant was then questioned until approximately 3:00 p.m., and Inspector Guffey was present the entire time either in the interview room or in the General Investigations Bureau's ("GIB") "GIB room" where he could watch the interview remotely.  (Tr. at 75:21-23, 76:25-77:13).  Inspector Guffey testified that Detective Demarius Jones, Detective Robert Brown, and Sergeant Ammons of the MPD were also present.  (Tr. at 77:14-19, 85:23-25).  Inspector Guffey and Inspector Newberry went into the room to question Defendant during some periods, and they left for Detective Jones and Detective Brown to question him during other periods, although Inspector Guffey states that he was able to watch the MPD questioning live throughout on a television feed.  (Tr. at 85:17-86:17).  Defendant initially denied all involvement in the robberies, although he was not combative, loud, yelling, or refusing to answer questions, so Inspector Guffey presented him with pictures from the scene and photographs they believed to be Defendant.  (Tr. at 92:12-93:8, 84:10-16).

Defendant was allowed two breaks from approximately 11:45 a.m. to 12:30 p.m. and from approximately 1:42 p.m. until 2:15 p.m.  (Tr. at 75:24-76:8, 84:3-85:16).  During these

8

breaks, Defendant was permitted to use the restroom and smoke, although Inspector Guffey testified that he was not the person who took Defendant either to the restroom or on a cigarette break. (Tr. at 76:9-11, 84:18-85:16, 87:25-88:5, 90:1-6). During the first break, Inspector Guffey testified that Defendant waited in the room while they all watched him through the live television feed. (Tr. at 87:6-24, 88:6-9). During the second break, from approximately 1:43 p.m. until 2:12 p.m., Defendant was removed from the interview room for a cigarette break, but neither Inspector Guffey nor Inspector Newberry were the ones who did so. (Tr. at 89:8-15, 89:18-25). Inspector Guffey also did not offer Defendant anything to eat or drink during the interview period, although Defendant was never denied a request for a bathroom break, food or drink, and did not indicate that he was physically uncomfortable or in pain. (Tr. at 84:23-85:1, 94:17-25). Inspector Guffey testified that, throughout the day, Defendant never asked for the questioning to cease, never asked for an attorney, and never complained about his treatment at the scene of arrest. (Tr. at 76:15-76:24, 77:23-25).

Ultimately, after his second break, Defendant was interviewed by Detective Jones, then Inspector Guffey and Inspector Newberry entered the room, and Defendant wrote out in his own words what occurred on a form for his Sworn Statement for Inspector Guffey and Inspector Newberry. (Tr. at 78:10-79:4, 90:17-91:2 & Exh. 3). He was read his *Miranda* rights again upon the taking of his Sworn Statement. (Tr. at 80:1-4 & Exh. 3). Inspector Guffey testified that his Sworn Statement constituted a full confession to the robberies of two victims, one of which was a postal carrier. (Tr. at 81:12-21). After Defendant provided the statement, Inspector Guffey and Inspector Newberry left the precinct. (Tr. at 91:15-18). Inspector Guffey testified

that, although he was the case agent, he did not request body camera or dash camera footage. (Tr. at 92:2-9).

Inspector Newberry also testified as to his interview of Defendant with Inspector Guffey. (Tr. at 97:5-25). He testified that Detective Jones, Detective Brown, and another detective whose name he could not recall were also present at the Mount Moriah precinct and questioned Defendant separately. (Tr. at 98:1-6). Inspector Newberry estimated that the room in which Defendant was interviewed was approximately "[e]ight by four" or "eight by five." (Tr. at 109:1-4). Inspector Newberry testified that Defendant was provided his *Miranda* rights at the beginning of the questioning, was provided two breaks during the questioning from 11:00 a.m. until 3:00 p.m., and never indicated that he wanted an attorney present. (Tr. at 97:20-22, 99:1-12, 99:18-100:25, 101:6-10, 103:9-18, 105:4-14, 106:15-107:6, 110:7-111:23, 112:11-5 & Exh. 2). Inspector Newberry was not informed by any other MPD officers that Defendant previously requested an attorney. (Tr. at 106:9-14). Inspector Newberry did not observe Defendant having any trouble understanding the questions asked in his *Miranda* waiver. (Tr. at 101:1-5). Inspector Newberry did not inquire about Defendant's mental health, whether he took medications or had missed any dosages thereof, whether he was intoxicated, or what level of education he had attained. (Tr. at 108:3-25).

Inspector Newberry testified that Defendant was initially "somewhat uncooperative" by denying his involvement, although he was not physically resistant, but then "calmed down" and became cooperative. (Tr. at 104:10-24, 114:7-11, 115:6-9). Inspector Newberry then presented Defendant with information gathered during the investigation. (Tr. at 114:115:3). Inspector Newberry testified that, at some point, he and Inspector Guffey terminated their interview,

10

Defendant waited for approximately an hour, and then Detective Jones and Detective Brown
entered to question him.  (Tr. at 109:22-110:3, 1112:7-10, 115:10-19).  Then, Defendant was
given a second break during which was removed from the interview room by Detective Jones
and Detective Brown to be allowed to smoke.  (Tr. at 113:6-17, 115:15-24).  Inspector Newberry
testified that, upon returning from the cigarette break, Defendant "admitted his involvement in
the criminal activity" to Inspector Newberry and provided a full confession.  (Tr. at 98:17-25,
101:14-22, 102:2-103:2, 113:18-114:6, 115:25-116:7 & Exh. 3).  Inspector Newberry testified
that Defendant seemed to understand what was going on when he provided his statement, that he
did not have any questions, that he did not complain of any sort of physical discomfort or
ailment, that he never stated that he had been assaulted or hurt in any way during his arrest, and
that he was never denied a request for food, water, or a bathroom break.  (Tr. at 103:3-8, 103:22-
104:9).  Inspector Newberry further testified that he never personally took Defendant to the
restroom or offered him food or drink.  (Tr. at 111:24-112:6).

Detective Jones testified that he was off work on February 2, 2017 but came in at
approximately 2:00 p.m. to interview Defendant at the Mount Moriah precinct along with
Detective Brown.  (Tr. at 120:12-121:122:3).  Detective Jones testified that Defendant was first
interviewed by Inspector Guffey and Inspector Newberry and that he and Detective Brown
arrived at the precinct at about the same time as each other after that initial interview had been
completed.  (Tr. at 122:2-123:21).  After briefly meeting in the GIB room, Detective Jones
testified that he and Detective Brown went into the interview room to question Defendant for the
first time.  (Tr. at 124:5-12).  Detective Jones was advised that Defendant had been in the
interview room for two to three hours.  (Tr. at 124:23-125:2).  They were advised that Defendant

had already been provided his *Miranda* rights.  (Tr. at 125:3-5).  Detective Jones testified that Defendant was shackled to and sitting on a hard bench that has the wall as a back.  (Tr. at 124:13-22).

Detective Jones testified that he and Detective Brown provided Defendant with information and details regarding the case and questioned him for approximately one to two hours.  (Tr. at 125:6-23).  During this period, Defendant continued to deny involvement in the alleged offenses.  (Tr. at 125:24-126:2, 136:24-127:3).  Detective Jones did not take Defendant to the restroom or offer him food or drink during this time.  (Tr. at 126:6-14).  Detective Jones testified that he also does not recall taking Defendant for a cigarette break with Detective Brown. (Tr. at 126:20-127:8, 131:15-137:7).  However, Detective Jones denied any allegations that he became frustrated with Defendant, held his arms above his head while Detective Brown struck him in the stomach, hit Defendant in the face, told him to "stop BSing," or offered him $10 to tell the truth.  (Tr. at 135:11-136:23).  Detective Jones testified that he "had eyes" on Defendant from the time he arrived at the precinct until Defendant left the precinct and did not participate in or witness anyone striking, hitting, or assaulting Defendant, threatening Defendant, or offering him money in exchange for a confession.  (Tr. at 141:3-10, 141:21-142:9, 145:16-17).  Detective Jones also did not hear Defendant request an attorney or ask for the questioning to cease.  (Tr. at 141:11-20).  Detective Jones recalls that Defendant ultimately gave an oral confession to himself and Detective Brown and a written confession to Inspector Guffey and Inspector Newberry.  (Tr. at 137:9-22, 137:23-140:9).  Although Detective Jones did not recall the time of the confession, his recollection was refreshed to show that Defendant signed the written confession at 5:15 p.m. and he signed it at 5:17 p.m.  (Tr. at 138:25-140:9).

Detective Brown testified that he was also called in to interview Defendant who was in the custody of postal inspectors. (Tr. at 149:14-150:7). Detective Brown approximates that he arrived around 2:00 p.m. and that he and Detective Jones were brought up to date on what was going on with the case by one of the postal inspectors. (Tr. at 150:1-11, 157:25-158:1). After about ten to fifteen minutes, Detective Brown testified that he and Detective Jones entered the interview room to speak with Defendant. (Tr. at 151:5-17). Defendant was shackled to the bench in a room Detective Brown approximated to be "eight by eight." (Tr. at 151:18-24). Detective Brown did not inquire about Defendant's education level, whether he was taking controlled substances, or whether he was intoxicated at the time although Defendant did mention that "he was squatting in a house and was on drugs." (Tr. at 164:21-165:14). Detective Jones testified that Defendant initially denied any involvement in the accused offenses. (Tr. at 152:12-24). Defendant was then presented with evidence in the case, including "debit cards [and] EBT cards," and he continued to deny any involvement. (Tr. at 152:25-153:17).

Detective Brown initially testified that he did not recall there ever being a significant break during the interview process except that Defendant may have been taken to the restroom and he believes he was given water. (Tr. at 153:21-154:5, 155:14-156:1, 158:2-4, 159:4-10). However, "eventually" Defendant "decided to go ahead" and "tell the truth." (Tr. at 156:2-21, 158:4-6). Specifically, Defendant confessed to using the victim's debit card and then gave a full oral confession that he and Detective Brown typed up. (Tr. at 156:10-157:18, 158:5-6).

On cross examination, Detective Brown recalled that he and Detective Jones "did take him on a smoke break in the back of the precinct." (Tr. at 159:23-160:7, 162:2-4). He explained that they went through the office, took an immediate right, walked through some glass doors, and

13

stood in the back parking lot where the squad cards were at, walked down a little sidewalk, and allowed Defendant to have a cigarette.  (Tr. at 160:10-17).  He testified that this is normally the "smoking area for even officers that want to smoke at the precinct" and that they "have a line that you have to smoke past, and that's where he was actually smoking at."  (Tr. at 161:14-20). Detective Brown recalled that the break lasted "[m]aybe five minutes or so" and that they stayed outside and did not enter any other buildings.  (Tr. at 162:5-20).  Detective Brown remembers that Defendant's attitude before the smoke break was that, "[i]f I have a cigarette, then we'll talk," and during the break that he said something to the effect of, "When we get back in there, I'll talk to you."  (Tr. at 160:20-23).  Detective Brown testified that Defendant did not ask for a lawyer or for questioning to cease, was not struck or assaulted in any way, and never became combative or assaultive during their questioning.  (Tr. at 160:24-161:7, 163:6-9, 166:16-167:5).  Detective Brown recalled that, after Defendant confessed to the criminal activity, he was "calm" and "apologized for robbing the postal workers."  (Tr. at 161:8-11).

Gary Myles, Investigator for the Federal Public Defender's Office, testified that he was asked to take some photographs of the area in which Defendant may have been taking a smoke break and that he did so.  (Tr. at 168:7-169:15, 169:24-25, 171:2-6, 171:16-10 & Collective Exh. 4).  He described the area as "the back of the precinct that faces the basketball court area once you exit the rear of the precinct."  (Tr. at 169:18-20).  Investigator Myles described the first two photographs appeared to show a "designated smoking area" near a picnic table with a cigarette disposal container and that an officer at the precinct told him that there was such a smoking area at the precinct.  (Tr. at 173:17-174:4, 174:6-19, 175:11-20).  Inspector Myles stated that the third photograph shows "a little small holding area for . . . some utility type apparatus and a

couple of bikes.  It looks like it could've been an old storage area or something like that."  (Tr. at 175:21-25, 178:1-8, 178:14-22).  This area also contained a "medicine ball," "some weights," and a "punching bag."  (Tr. at 178:14-22, 179:9-17).  Inspector Myles testified that this storage area was next to the designated smoking area and that he did not see anyone in there when he took the photographs.  (Tr. at 176:1-3, 178:23-25).  Inspector Myles stated that the next photographs showed a space where he was told by a precinct officer that "used to be an area where they would do maintenance on vehicles" but now was a "storage facility" with "file cabinets and things of that nature."  (Tr. at 176:4-177:7).  As part of his investigatory work, Inspector Myles also identified Defendant's booking photograph from the Shelby County Sheriff's Office.  (Tr. at 179:23-182:11 & Collective Exh. 5).

After being advised of his right to testify or not testify on his own behalf, Defendant elected to testify as to the events on the date of his arrest and questioning.  (Tr. at 184:5-186:15).  Defendant testified that, on February 2, 2017, he woke up and got "high," as he does every day by using heroin and cocaine.  (Tr. at 188:12-15, 195:9-10, 196:1-13, 200:2-3, 232:6-9).  He then started to go to the store because he was hungry.  (Tr. at 188:12-15, 196:15-17, 200:2-3).  When he exited the Dogwood Trace Apartments and was crossing the street, "a man hopped out of his car with his gun drawn."  (Tr. at 188:16-22).  Defendant stated that he "didn't know who he was" but that he "just told me to freeze and stop."  (Tr. at 188:22-23, 189:13-15).  Defendant identified the man from his testimony at the evidentiary hearing as Inspector Weeks.  (Tr. at 188:24-8, 193:13-14 & Collective Exh. 1).  Defendant testified that his "first reaction was indeed to run," but when he turned around, another car was behind him.  (Tr. at 189:15-17).  Defendant testified that "they hopped out of their car, a woman and another man, and they had their guns drawn."

(Tr. at 189:18-20).  Defendant identified the second man from his testimony at the evidentiary
hearing as Inspector Riggs.  (Tr. at 189:24-190:6).  Defendant stated that he "didn't do nothing,"
"just stood there," and "they came and upheld me."  (Tr. at 189:19-21).

Defendant testified that Inspector Weeks then holstered his weapon, grabbed his arm, and
placed him in handcuffs.  (Tr. at 190:10-12).  Defendant stated that his first question was,
"What's going on?  Why y'all arresting me for?"  (Tr. at 190:13-14).  Defendant testified that
they told him to "shut up and be quiet and face [the] vehicle" and that they pushed him up
against it.  (Tr. at 190:15-16).  Defendant stated that he continued to question what was
happening, saying "I need to know what's going on.  How can y'all just upheld me and don't tell
me what's going on?"  (Tr. at 190:16-20).  Defendant testified that, once he was in handcuffs, he
stood for about ten to fifteen seconds, and then they told him to sit on the curb, which he did.
(Tr. at 190:20-22).  Defendant stated that he continued to "constantly" ask "what was going on."
(Tr. at 190:22-23).  Defendant testified, however, that he had not been injured or "struck" at this
point.  (Tr. at 193:19-23).

Defendant testified that he waited about ten to fifteen minutes sitting on the curb until
Officer Boyd arrived in his MPD vehicle.  (Tr. at 190:25-191:1-23).  Defendant stated that
Officer Boyd came and got him off the ground, at which time he said, "Man, I need an attorney
because they . . . ain't telling me what's going on.  I need to know what's going on.  Why they
arresting me and they ain't talking to me?  They keep telling me to be quiet.  I'm going to need an
attorney."  (Tr. at 192:5-11, 216:3-217:13).  Defendant testified that Officer Boyd told him,
"Man, I'm just fixing to transport you to the Mount Moriah Precinct.  I'm going to let the officers
or detectives know when you get there that you asked for an attorney."  (Tr. at 192:12-15,

16

210:10-13). Defendant testified that Officer Boyd transported him to the precinct, which took five to seven minutes, but that he did not hear Officer Boyd tell anyone about his request. (Tr. at 192:15-21, 194:2-13). Defendant testified that, when they arrived at the precinct, he told Officer Boyd, "Don't forget to ask them for an attorney. I need an attorney." (Tr. at 194:15-20, 216:3-217:13). Defendant also asked to make a phone call and testified that he was told, "Well, whatever. The detective or the officer here should provide it for you." (Tr. at 194:21-25). Defendant testified that he was then taken into a "small room," placed on a "little hard wooden chair," and was handcuffed by his left ankle to the bench. (Tr. at 194:25-195:6). Defendant described himself as "intoxicated," "high on [his] mind," and "very confused." (Tr. at 195:10, 196:18-19, 214:25-215:14). He testified that he recalled his requests for an attorney and telephone call well despite his intoxication. (Tr. at 216:3-18).

Defendant testified that he sat in the room for a "long time," which he estimated to be thirty to forty-five minutes, with no one telling him anything. (Tr. at 195:9-14, 195:22-25). Defendant stated that, the first ten minutes, Defendant "kept hollering" their names, asking, "What's going on? Somebody come talk to me." (Tr. at 195:15-17). Defendant testified that he put his hood over his shoulders and head "trying to get comfortable because the seat was hard" and sat with a "cuff" tight around his ankle. (Tr. at 195:17-21). Defendant testified that he finally fell asleep until the door opened and Inspector Guffey, Inspector Newberry, and a man who Defendant presumed to be a sergeant because he was not wearing a "postal inspector" windbreaker jacket, entered the room. (Tr. at 197:11-198:12, 201:21-202:2).

Defendant testified that when the interview process began, no one asked if he was high or intoxicated, whether or not he had taken his blood pressure medication, or what level of

education or abilities to read and write he had attained.  (Tr. at 196:23-197:8, 211:13-16).

Defendant testified that he also has learning disabilities about which he was never asked.  (Tr. at

211:5-16).  Instead, they "just came straight forward and started questioning" him.  (Tr. at 197:9-

10).  Defendant stated that he did not request an attorney again at this point because he assumed

that Officer Boyd had relayed his request.  (Tr. at 210:14-15).  Defendant stated that when they

went over forms regarding his rights, he just heard them saying "a whole bunch of words" and

was really "paying no attention to the words they were saying" because he had no idea what they

meant.  (Tr. at 210:20-25).  Defendant stated that they told him to "sign fast" and they were

"moving papers so fast" but he didn't know what was going on.  (Tr. at 211:1-2).  Defendant

stated that, on top of that, he was intoxicated and "[e]verything was just happening so fast" and

"spur of the moment."  (Tr. at 211:1-4, 217:14-218:8).  Defendant admits that he did ultimately

sign the *Miranda* rights waiver at 11:04 a.m.  (Tr. at 218:13-220:15).  Defendant testified that he

now understands the rights listed on the *Miranda* waiver but did not understand that anything he

said could be used against him in court at the time of the questioning.  (Tr. at 220:25-225:24).

Defendant stated that he also understood his right to an attorney at the time of questioning but

that he assumed when he asked for one previously, the detectives were told about his request.

(Tr. at 222:5-10).

  Defendant testified that the postal inspectors began the interview by asking Defendant's

name and how he was doing, to which he responded, "I'm De'Lewis Hollins, and I want to know

what I'm doing in here.  Why y'all questioning me?"  (Tr. at 193:13-17).  Defendant stated that,

in response, Inspector Newberry "opened up a folder and took some pictures out" and showed

him a picture of him "standing in the store with money" in his hand "purchasing items."  (Tr. at

198:19-22).  Defendant replied, "Yeah, that look[s] like me buying some—paying cash for some food items.  What does that have to do with anything?  I'm purchasing with money."  (Tr. at 198:23-199:1).  Defendant was then shown a photo of someone "trying to use a card" and asked if that was also him, to which Defendant responded, "It look[s] just like the same person it did in the first one.  Yeah, it looks like me."  (Tr. at 199:2-5).  Defendant was then shown a picture of a "Regions bankcard" and asked whose name was on it. (Tr. at 199:6-7).  Defendant looked at it and responded that the name on the card was Tanisha Hall.  (Tr. at 199:8-9).  Inspector then asked Defendant how he came in possession of an EBT card that was allegedly used at that store. (Tr. at 10-14).  Defendant said he was "trying to think" and also told him, "Man, I don't have a — if I tell you what happened on that day, I'd be lying because I don't understand.  I can't take — I don't remember exactly what happened that day, I'd be lying because I don't remember exactly what happened."  (Tr. At 199:13-22).  Defendant testified that the inspectors and other officer then started asking him "random questions" that he couldn't remember.  (Tr. at 199:20-25, 200:7-13).

Defendant testified that the inspectors and officer eventually left the room and that he sat and waited until Detective Brown and Detective Jones entered.  (Tr. at 200:14-20, 202:2-8). Detective Brown and Detective Jones began questioning Defendant about the "same thing," about another victim named Ramirez, and asked "did I upheld a lady from behind."  (Tr. at 200:21-23).  Defendant responded, "No, I ain't did none of that.  How — I ain't upheld nobody. Where is this all coming from?"  (Tr. at 200:21-25).  Defendant testified that they then asked, "So this picture right here in the store, using the EBT card, you didn't take this from the Ramirez lady?"  (Tr. at 201:1-4).  Defendant replied, "Who is Ramirez?  Who is this?  I don't know who

this woman is. I didn't do nothing. Y'all just got me sitting here." (Tr. at 201:5-7). Defendant testified that, after his response, he assumed that "they figured I wasn't cooperating with them how they wanted me to, [and] they left out again." (Tr. at 201:8-10).

Defendant stated that they were not gone long until they came in and asked him if he wanted a cigarette and he responded that he did. (Tr. at 201:13-17). They removed his leg shackle, "left out together," took him out of the room, down a hallway, out the same door where he had entered with the MPD officers, around a corner, and the removed his handcuffs. (Tr. at 201:17-18, 202:8-22). Defendant testified that they opened the door to a small room at the back of the precinct where no one else was at that was "dirty" with "debris everywhere," and when Defendant entered behind Detective Brown, Detective Jones grabbed him immediately and said, "You [are] going to stop bullshitting me, and you [are] going to tell me exactly what is going on because I know you did it. You did it." (Tr. at 202:25-203:7, 225:25-227:15, 233:14-24). Defendant stated that Detective Jones then held him and Detective Brown punched him in the stomach and he responded, "Man, I ain't do nothing, man." (Tr. at 203:6-13, 225:25-227:15). Defendant testified that he "doubled over" and said, "What did you hit me for? This is brutality." (Tr. at 203:15-17). Detective Jones continued talking, saying, "I don't want to hear none of that. You going to tell me what is going on. And if you didn't do it, just by happenchance [sic] you didn't do it — I just came in off work. I ain't got — I just came in. This supposed to be my off day. I just came in. I ain't got no time to be constantly being up here all day investigating no robbery. And if you didn't do it, we'll talk to you about this case. You going to tell me who did it. You going to tell them what you already learned, and you going to use your imagination." (Tr. at 203:17-204:1, 209:1-6, 225:25-227:15).

Defendant testified that Detective Brown smoked a cigarette, passed it to Detective Jones, and sat behind him smiling.  (Tr. at 204:2-4).  Defendant stated that Detective Jones then said, "Man, look, bro" while patting him on the shoulder, and told him, "Man, just go on and write the statement.  We going to let you go home.  You know, I'm going to give you $10.  You can get high and forget about all this.  Just tell him, just tell [Detective] Brown what [he wants] to hear, just tell him."  (Tr. at 204:5-10, 209:5-6, 234:6-19).  Defendant stated that, at that point, his stomach was hurting and he didn't want to "hear nothing" when Detective Jones "hauled off and punched [him] in the side of his face."  (Tr. at 204:11-13, 225:25-227:15).  Defendant testified that the later photographs taken of him show the swelling on his face from being punched.  (Tr. at 212:12-213:4 & Collective Exh. 5)  Defendant testified that he "caved in" and said, "All right.  Man, I don't want no more problems.  I'll tell you what's going on.  I'll tell you whatever you want me to say.  I'll say it."  (Tr. at 204:13-16, 211:17-23).  Defendant stated that he was with Detective Brown and Detective Jones "about 30 minutes at the least" and "[m]uch longer than it'd take to smoke a cigarette."  (Tr. at 204:17-23).  Defendant further testified that the room photographed by Inspector Myles with exercise equipment was the same room where he was taken.  (Tr. at 204:24-205:4).  Defendant stated that he recognized it because of the punching bag, a ball, and filing cabinets.  (Tr. at 205:7-207:3).  Defendant testified that he remembered "what was going on at the end when they were beating [him]" better than he remembers the beginning of the interview because "[a]nyone can remember when someone puts their hands on you."  (Tr. At 215:15-216:7).

After Defendant stated that he would tell them what they wanted to hear, Defendant says Detective Jones "started smiling like he had achieved something."  (Tr. at 207:8-9).  Defendant

21

testified that he looked at Detective Brown, shaking his head. (Tr. at 207:9-10). Defendant stated that the detectives picked him up and, instead of putting the handcuffs in front of him, they put them behind him and took him back to the interrogation room. (Tr. at 207:10-13). Defendant testified that, when they returned to the interview room, they sat him down, took the handcuffs off of him, and put his "legs back on it, tight." (Tr. at 207:14-15).

Defendant stated that Inspector Guffey and Inspector Newberry then came in and asked if he was "ready to go ahead and stop BSing around and tell [them] what really happened." (Tr. at 207:15-18, 227:2-229:19). Defendant testified that he did not want to tell Inspector Guffey and Inspector Newberry about being assaulted by Detective Jones and Detective Brown because he was afraid and did not know if they were working together. (Tr. at 228:1-229:19). Thus, Defendant stated that he let his head down, "thought about it one more time," with his face and stomach hurting, and "started telling them, to the best of [his] ability, what [he] learned that day and what they told me from the pictures [he] had seen." (Tr. at 207:19-23). Defendant stated that he "just let it come out the way they depicted it." (Tr. at 207:24-25). Defendant stated that he wrote the confession for the postal inspectors and "just said it the way they wanted it to be said" so that they would "stop doing what they were doing." (Tr. at 208:1-23, 209:7-12, 229:20-231:25, 232:21-233:13). He said that neither Detective Brown nor Detective Jones told him "exactly what to say" but that Detective Jones did tell him, "use what I have already — what you have already learned today, and use your imagination to go with it." (Tr. at 209:1-4). Defendant testified that the postal inspectors then left, and Detective Brown and Detective Jones came back into the room. (Tr. at 209:13-15). Defendant stated that "they did pretty much the same thing with the papers, had me sign." (Tr. at 209:15-17). Defendant testified that Detective Brown then

left, but Detective Jones stayed to give him a ten dollar bill and then left. (Tr. at 209:18-20). Defendant stated that he thought he was about to leave but remained shackled to the chair, at which time he yelled, "Why I'm still shackled to the chair if you fixing to let me go?" (Tr. at 209:21-23). Defendant stated that Detective Jones didn't say anything but "kept going." (Tr. at 209:23-24). Defendant stated that another officer then came in and told him to stand up, took off the leg restraint, and put him in handcuffs. (Tr. at 209:25-210:3). Defendant testified that he asked why he was being placed in handcuffs if he was about to go home, at which time the officer told him he was being transported downtown to 201 Poplar and being charged with two counts of aggravated robbery. (Tr. at 210:3-9, 212:3-5). Ultimately, the Court recommends that Defendant's testimony regarding the events that transpired from the time of his arrest through the interrogation at the Mount Moriah precinct is not credible based upon the internal inconsistencies further discussed herein.

### III.    Proposed Analysis

Defendant's Motion to Suppress asserts that his rights under the Fifth Amendment, Sixth Amendment, and Fourteenth Amendment were violated during his questioning at the Mount Moriah precinct.[1] The Court will consider the alleged violations sequentially.

#### a. *Sixth Amendment Right to Counsel*

First, Defendant asserts that he twice informed Officer Boyd that he wanted an attorney but that Officer Boyd did not relay that request to Inspector Guffey, Inspector Newberry, Detective Jones, Detective Brown, or any other law enforcement officer at the Mount Moriah

---

[1]  Defendant conceded at the hearing that he is not alleging any wrongdoing by Inspector Weeks or Inspector Riggs at the scene of arrest and that the initial constitutional violation would have taken place when Officer Boyd did not inform the officers at the Mount Moriah precinct of Defendant's request for an attorney. (Tr. at 244:17-246:4).

precinct.  Defendant alleges that he thought that these requests were sufficient to invoke his right to counsel and did not understand why he was not provided an attorney.  The Government responds that Defendant never requested an attorney at the precinct, showed no signs that he did not understand the rights he was waiving, was informed of his right to counsel, and thereafter waived his right to counsel by executing the rights waiver form.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings."  *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citing *United States v. Wade*, 388 U.S. 218, 227-28 (1967); *Powell v. Alabama*, 287 U.S. 45, 57 (1932)).  "The Sixth Amendment right to counsel is triggered at the time that judicial proceedings have been initiated . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  *Fellers v. United States*, 540 U.S. 519, 523 (2004) (citing *Brewer v. Williams*, 430 U.S. 387, 398 (1977)).  The Sixth Amendment right to counsel is violated if federal agents "deliberately elicited" his own self-incriminating statements after judicial proceedings have been initiated in one of the aforementioned ways.  *Fellers*, 540 U.S. at 523-24 (citing *Massiah v. United States*, 377 U.S. 201, 206 (1964)).

As the Court will discuss in greater depth, *infra*, during the consideration of his Fifth Amendment rights, the Court recommends that Defendant's testimony that he told Officer Boyd that he wanted an attorney twice while he was being transported to the Mount Moriah precinct is not credible.  Further, and more importantly, the Court recommends that, as the adversary

judicial process had not been initiated either during Defendant's transport or during Defendant's custodial interrogation, the Sixth Amendment right to counsel does not apply at this stage. Accordingly, it is recommended that Defendant's Sixth Amendment rights were not violated during his transport or subsequent questioning.

### b. *Fifth Amendment Right to Counsel*

Defendant also asserts that the same events that ran afoul of the Sixth Amendment right to counsel also violated the Fifth Amendment right to counsel. The Fifth Amendment right to counsel stems from the United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, in which it held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from the custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444. "As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right to silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*. Any waiver of these rights must be made "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. 436, 444 (1966). The Government must prove that the Defendant waived his *Miranda* rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

"[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick . . . ."

25

*Montejo*, 556 U.S. at 786; *see also Patterson*, 487 U.S. at 296.  However, if "an accused has invoked his right to have counsel present during custodial interrogation . . . [he] is not subject to further interrogation by the authorities until counsel has been made available," unless he initiates the contact.  *Montejo*, 556 U.S. at 787 (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (citing cases)).  "The *Edwards* rule is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights."  *Montejo*, 556 U.S. at 787 (citing *Harvey*, 494 U.S. at 350).  "It does this by presuming his postassertion statements to be involuntary, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards."  *Montejo*, 556 U.S. at 787 (*citing McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991)).

As already set forth, the Court recommends that Defendant's testimony that he told Officer Boyd that he wanted an attorney twice while he was being transported to the Mount Moriah precinct is not credible.  First, Officer Boyd does not recall Defendant requesting an attorney at any time.  Second, when advised of his *Miranda* rights, including his right to an attorney, Defendant concedes that he did not invoke this right; in fact, he affirmatively waived it by placing his initials beside the following statements: "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning."; "If you cannot afford a lawyer, one will be appointed for you."; and, "If you decide to answer questions now, without a lawyer present, you will still have the right to stop answering questions at any time.  You have the right to stop answering questions until you talk to a lawyer."  (Tr. at Exh. 2).  Defendant additionally signed the following statement: "I am willing to discuss subjects presented and answer questions.  I do not want a lawyer at this time.  I understand and know

what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." (*Id.*)  Thus, the Court recommends that Defendant did not invoke his Fifth Amendment right to counsel.  As such, the Court recommends that the *Edwards* rule did not prevent Inspector Guffey, Inspector Newberry, or any other law enforcement officers from initiating questioning at the Mount Moriah precinct.  The Court further recommends that, after being advised of his *Miranda* rights, Defendant voluntarily, knowingly, and intelligently waived them by executing the rights waiver form at 11:04 a.m. and 11:05 p.m. (*Id.*)

The Court makes the recommendation that Defendant waived his *Miranda* rights despite Defendant's assertion that he was too intoxicated, unmedicated, mentally ill, uneducated, or confused to do so.  As to Defendant's level of intoxication, while he testified that he got "high" that morning, neither Inspector Guffey, Inspector Newberry, Detective Brown, or Detective Jones observed any signs that he was intoxicated or was not able to voluntarily, knowingly, or intelligently waive his rights.  As to whether Defendant had taken his blood pressure medication or whether he suffered from mental illness, the record contains no indication of what effect or effects these would have had or what symptoms he might display as a result thereof that would prevent him from voluntarily, knowingly, or intelligently waiving his rights.  As to Defendant's level of education and his assertion that he was confused, Defendant testified that he understood all of the rights on the day he was interrogated, including the right to an attorney, with the exception of the fact that he asserts he did not understand anything he said could be used against him in court at the time of the questioning.  Although Defendant asserts that he did not understand this one aspect, the record does not indicate that Defendant asked for any clarification of this information but instead completed the waiver without asking any questions.  Specifically,

Defendant placed his initials by the statement, "Anything you say can be used against you in court." (Tr. at Exh. 2). As the *Montejo* court acknowledged, the completion of the rights waiver form generally is sufficient to constitute a waiver of the *Miranda* rights, and the Court recommends there is no exception here. Accordingly, the Court recommends that the preponderance of the evidence demonstrates that Defendant's Fifth Amendment right to counsel was not violated during his custodial interrogation.

### c.   *Fourteenth Amendment Due Process*

Finally, Defendant asserts that his confession violated his Fourteenth Amendment right to due process. The United States Supreme Court held in *Miller v. Fenton*, 474 U.S. 104 (1985), that "tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." *Id*. At 110. Further, "even after holding that the Fifth Amendment privilege against compulsory self-incrimination applies in the context of custodial interrogations" in *Miranda*, the Court has "continued to measure confessions against the requirements of due process." *Id*. If the interrogation techniques, "either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice," they must be "condemned under the Due Process Clause of the Fourteenth Amendment." *Miller*, 474 U.S. at 109 (citing *Brown v. Mississippi*, 297 U.S. 278 (1936)).

Here, as the Government conceded at the evidentiary hearing, Defendant's allegations, if believed, are extraordinarily serious and would certainly raise significant due process concerns. However, the Court recommends that Defendant is not credible when he testified that Detective Brown and Detective Jones assaulted him and paid him cash to confess to the allegations. First,

28

Detective Brown and Detective Jones testified under oath that they did not physically harm Defendant in any way. Detective Jones also testified that he did not offer Defendant any money to confess, and there is no evidence that Defendant had money in his possession when he was booked into the jail. Second, there are no other individuals who saw the alleged assault upon Defendant. While this could be explained by the remote location where Defendant alleges that he was taken, there is no plausible explanation for the fact that neither Inspector Newberry nor Inspector Guffey reacted in any way to Defendant's appearance or demeanor when he returned from the cigarette break. Although Defendant claims that he did not want to tell Inspector Newberry or Inspector Guffey what actually transpired, which would be understandable, but it continues to belie logic that no one noticed that Defendant had been struck in the face sufficiently to cause noticeable swelling that was allegedly still present when he was booked into the jail when he returned immediately after the alleged assault to the interview room. Finally, although Defendant states that the photographs at Collective Exhibit 5 show the swelling, the Court cannot discern any noticeable swelling. There is also no evidence that Defendant mentioned any injuries when he arrived at the jail and was out of the custody of the detectives and postal inspectors who previously interviewed him and, as to the detectives, allegedly harmed him. Thus, the Court recommends that the preponderance of the evidence demonstrates that Defendant's Fourteenth Amendment right to due process was not violated at any point during his custodial interrogation.

### d.   *Fruit of the Poisonous Tree*

Finally, Defendant asserts that any evidence obtained as a result of the unconstitutionally obtained statements should be suppressed as fruit of the poisonous tree as set forth in *Wong Sun*

*v. United States*, 371 U.S. 471, 484 (1963).  As the Court recommends that there were no violations of the Fifth, Sixth, or Fourteenth Amendments in eliciting Defendant's statements, the Court further recommends that no evidence should be suppressed pursuant to the fruit-of-the-poisonous-tree doctrine.

## IV. Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

DATED this 16th day of March, 2018.


s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE


**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**